Filed 10/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SNOWBALL WEST INVESTMENTS L.P., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Respondent. | B314750 <br><br> (Los Angeles County Super. Ct. No. 20STCP00771) |

 APPEAL from an order of the Superior Court of Los Angeles County, Mitchell L. Beckloff and Robert S. Draper, Judges. Affirmed.

 Gaines & Stacey, Fred Gaines and Lisa A. Weinberg for Plaintiff and Appellant.

 Holland & Knight, Daniel R. Golub, William E. Sterling for California Building Industry Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Zacks, Freedman & Patterson, Ryan J. Patterson, Brian O'Neill for Yes In My Back Yard as Amicus Curiae on behalf of Plaintiff and Appellant.

Matthew Gelfand and Allyson Richman for Californians for Homeownership as Amicus Curiae on behalf Plaintiff and Appellant.

June Babiracki Barlow for Californians Association of Realtors as Amicus Curiae on behalf of Plaintiff and Appellant.

Michael N. Feuer, Hydee Feldstein Soto, City Attorneys, Denise C. Mills, Chief Deputy City Attorney, Terry P. Kaufmann Macias, John W. Heath, Assistant City Attorneys, Donna Wong, Deputy City Attorney for Defendant and Respondent.

---

## I.    INTRODUCTION

Snowball West Investments, LP applied to build a housing project consisting of 215 homes in the Sunland/Tujunga area of the City of Los Angeles.  The current zoning for the site is RA and A1; the project must be rezoned to RD5 and R1 for the project to move forward.  The City denied Snowball's zone change request, stating that more information was needed before building homes in a high wildfire hazard area.  Snowball petitioned for a writ of mandate, which was denied. Snowball appealed.

Snowball argues that under the rezoning exemption in the Housing Accountability Act (HAA), Government Code section 65589.5, subdivision (j)(4)[1] (section 65589.5(j)(4)), its project is exempt from the need for a zone change.  That subdivision states that "a proposed housing development project . . . shall not

_____

[1]    All further statutory references are to the Government Code unless otherwise indicated.

2

require a rezoning" if the housing development project is consistent with local requirements "but the zoning for the project site is inconsistent with the general plan." Snowball argues that because the current zones for the project site, RA and A1, are not expressly listed in the general plan, the zoning for the site is "inconsistent" with the general plan. Consequently, the rezoning exemption in section 65589.5(j)(4) excuses the need for a zone change. The City disagrees, asserting that even though zones RA and A1 are not expressly listed in the general plan, they are nevertheless incorporated by reference, because the general plan allows all zones that are "more restrictive" than the ones listed. The City argues that because zones RA and A1 are more restrictive than the zones listed in the general plan, they are therefore "consistent" with the general plan, so the rezoning exemption in section 65589.5(j)(4) does not apply. We agree with the City that the zoning is consistent based on the language of the general plan, and therefore section 65589.5(j)(4) does not exempt Snowball's project from the requirement of a zone change.

Snowball further asserts that when denying the zone change, the City was required to make findings required by another subdivision of the HAA, section 65589.5, subdivision (j)(1) (section 65589.5(j)(1)). However, section 65589.5(j)(1) applies only when "a proposed housing development project complies with applicable, objective general plan, zoning, and subdivision standards and criteria . . . in effect at the time that the application was deemed complete." (§ 65589.5(j)(1).) Snowball's project did not comply with the zoning in effect because it required a zone change. Therefore, this subdivision also does not apply.

3

Finally, Snowball contends the City failed to make findings required under the Los Angeles Municipal Code (LAMC) when denying the zone change and that any such findings were not supported by substantial evidence. We hold that the findings were sufficient and were supported by substantial evidence. We therefore affirm the superior court's denial of Snowball's writ petition.

## II.  BACKGROUND

### A.  Factual background

#### 1.  *The proposed project*

Snowball owns eight parcels of land totaling 58 acres at 6433 La Tuna Canyon Road. From the 1960s to 2016, part of the property was the Verdugo Hills Golf Course. The site is bounded by a single-family residential development (Tujunga) to the north, La Tuna Canyon Road and the Foothill Freeway (Interstate 210) to the south, Tujunga Canyon Boulevard to the east, and vacant hillside terrain to the west. The site is in a "very high fire hazard severity zone." (See §§ 51177, subd. (i), 51178.)

In 2007, Snowball filed an application with the City requesting a zone change, site plan review, and project permit compliance for a development consisting of 229 homes on about 28 acres of the property (the project). Snowball later revised its application, requested a vesting zone change, and converted its project to 208 "small lot" units and seven single-family homes, for a reduced density of 215 homes.

The zoning for the project area is currently A1 and RA, which allows for a maximum density of 19 single-family homes.

4

Snowball sought to change the zone to RD5, with a small portion as R1.[2]

The project went through several iterations, and worked its way through the approval process.  In June 2019, the City Planning Commission (City Planning) issued a determination letter approving much of the project; a corrected letter was sent in July 2019.  The letters noted that approval was conditioned on a future zoning change: "Approval of zone change to RD5-1 Zone and R1-1 Zone is required prior to obtaining clearance from Zoning Section."  City Planning's determination letter also stated that the "approval of the tract map is conditioned upon the approval of" Snowball's requested zone change: "In the event [the zone change] is not approved, the number of dwelling units shall be limited to that permitted by the existing A1-1 and RA-1 Zones and a revised tract map shall be submitted for approval."

---

[2]     Zone A1 allows development including one-family dwellings, parks, playgrounds, community centers, golf courses, and certain agricultural uses.  (LAMC § 12.05.) Zone RA includes one-family dwellings, parks, playgrounds, community centers, and golf courses.  (LAMC § 12.07.)  Zone R1 includes one-family dwellings, parks, playgrounds, and community centers.  (LAMC § 12.08.)  Zone RD5 typically includes one-family dwellings, two-family dwellings, group dwellings, apartment houses, parks, playgrounds, and community centers.  (LAMC § 12.09.1.)  At the project site, however, RD5 zoning is restricted to "detached housing."  The zones are sometimes listed as, A1-1, RA-1, R1-1, and RD5-1. According to the City, the "'-1' is a height district reference, and does not impact the uses or density in this case[ ]."  Part of the area is designated Minimum Low Residential and zoned RE40-1.  The project designates this area as open space, and it is not at issue in this appeal.

5

The corrected determination letter also stated, "Upon approval of the recommended [RD5 and R1] Zones, the respective portions of the Project Site will be consistent with the General Plan land use designations of Low Medium I and Low Residential."  City Planning recommended that the City Council approve Snowball's vesting zone change request.

The determination letter included a section titled "Fire Protection," addressing concerns expressed by the Los Angeles Fire Department (LAFD).  In a memorandum to City Planning in September 2017, LAFD had stated, "Development of the project will expose additional people to local fire hazards. The City of Los Angeles Fire Department considers the existing fire fighting [*sic*] facilities in the vicinity inadequate to protect the site.  The Fire Department also believes that the single access route to the site as proposed presents a potential adverse impact."  LAFD therefore recommended that the project include certain mitigation measures to limit potential fire damage, such as irrigated greenbelts around buildings, noncombustible roofs on structures, regular brush clearance of the area, and the inclusion of fire lanes.  The LAFD memorandum also stated, "At least two different ingress/egress roads for each area, which will accommodate major fire apparatus and provide for major evacuation during emergency situations, shall be required."  The memorandum concluded, "The inclusion of the above recommendations, along with any additional recommendations made during later reviews of the proposed project[, w]ill reduce the impacts to an acceptable level."

City Planning's determination letter to Snowball included the LAFD's recommended mitigation measures, and stated, "With implementation of mitigation measures, construction of the

6

Project would not be expected to affect the LAFD's ability to respond to emergencies. . . ." City Planning also required that "[a]t least two different ingress/egress roads shall be provided for each area that will accommodate major fire apparatus and provide for major evacuation during emergency situations."

City Planning's findings were not appealed to the City Council, and therefore became final. The zone change was the final approval required for the project to move forward.

2. *The City denies the zone change request*

The City Council's Planning and Land Use Management Committee (PLUM) considered Snowball's zone change request at a meeting on December 10, 2019. Before the meeting, Snowball submitted a letter to PLUM asking that PLUM recommend approval of the zone change request. Snowball also asserted that under the HAA, it was "entitled to density allowed by the general plan. (Gov. Code Section § 65589.5(a)(j)(4) [*sic*].)"

The record also includes hundreds of pages of written messages from the public to PLUM regarding the project, some in favor and many against. Some of the public comments attached newspaper articles or other information about wildfire hazards, traffic, housing, and the environment. One attachment showed more than 2,000 signatures on a change.org petition to "Save Verdugo Hills Golf Course open space say no to Snowball West Development." State Senator Anthony J. Portantino, representative for the 25th District, in which the project is located, submitted a statement that he "join[s] the community in preferring that this entire site be preserved as open space." Retired LAFD chief Andrew P. Fox submitted a letter in support of Snowball, stating that the current undeveloped condition of the property was itself a fire hazard; the community center portion of

the housing project could be used for people to "shelter in place" during a wildfire; and the project was close to the freeway, which is good for rapid evacuations.

City Council member Monica Rodriguez, representative for City District 7, in which the project is located, submitted a letter before the meeting recommending that the vesting zone change be denied. The letter stated, "I do not believe that the requested zone change is consistent with good zoning practices, and I have serious concerns regarding the potential public health and safety risks posed by the increased density being proposed at this site." She stated that the zone change "would increase the density by allowing the construction of 215 units instead of the 19 units that could be built by-right. Granting the zone change would be inconsistent with the surrounding density of the subject site, and is not consistent with good zoning practice. Allowing the requested zone change will increase density in a manner that is not to scale and is incompatible with the existing environment. The proposed density of this development is not appropriate for the subject site."

Rodriguez's letter continued, "The subject site, only having two ingress/egress points, is located at a critical access point for the existing single family residential properties along Tujunga Canyon Boulevard north of I-210. That fact, in combination with the subject site's topography and location within the City's Very High Fire Hazard Severity Zone raises real concerns about fire and life safety that need to be placed paramount."

The letter further stated, "Within the last two years, the foothill communities of my district were center stage to what were respectively the two largest wildfires in the City's recent history—the Creek and La Tuna Fires. Since this item was heard

at the City Planning Commission in May, the Seventh District saw *yet another* fire erupt within the Very High Fire Hazard Severity Zone—the Saddle Ridge Fire." Rodriguez noted that the City Council had recently assembled a "Wildland-Urban Interface Hazard Mitigation Task Force to reevaluate several issues, including additional development, current building codes and standards within the Very High Fire Hazard Severity Zone."

Rodriguez's letter continued, "The proposed project site's absence from the City's Regional Housing Needs Assessment (RHNA) further highlights the project's inconsistency with good zoning practice. The City of Los Angeles periodically completes a RHNA, pursuant to State law. This analysis determines strategic and desirable areas to allocate the necessary housing to accommodate projected growth throughout the city. The City's RHNA allocation excludes the subject site's parcels from the suitable site selection because they are located within a hillside area subject to the Slope Density Ordinance. As such, a positive finding cannot be made that the requested zone change is consistent with good zoning practice." Rodriguez asked that the zone change request be denied.

At the PLUM meeting on December 10, 2019, the president of the Sunland-Tujunga Neighborhood Council read a community impact statement opposing the development, citing the very high fire hazard severity zone, the high wind velocity zone, the destruction of keystone tree species, and concerns about small ingress/egress roads being able to support the evacuation of 215 families in the presence of firefighting equipment and other hazards. Other community members stated that they opposed the project for similar reasons. Snowball's counsel also spoke, stating that all approvals except the zone change were final, and

arguing that the current zoning was "illegal" but the new zone would comply with the City's general plan.

The PLUM members discussed whether the zone change was mandatory or discretionary. A person from City Planning stated that the zone change was discretionary.

Councilmember Marqueece Harris-Dawson stated, "[B]ased on the comments made by the Council District 7 representative, as well as comments made by the public today regarding recent wildfires, the site's topography, ingress and regress [*sic*] traffic issues, more environmental analysis is needed and so I move that we deny the request [for a] vesting zone change and adopt the findings that have been read into the record by the representatives of Council District 7. There's no objection." Another councilmember seconded the motion, and Harris-Dawson stated, "If there's no objection that will be the order. Thank you." The meeting concluded. PLUM stated in a report that "the Committee adopted the findings presented by Council District 7 as the findings of the PLUM Committee recommended that Council adopt the new PLUM Committee findings and not present and order filed the Ordinance effectuating the zone change [*sic*]."

The following morning, December 11, 2019, the City Council considered PLUM's recommendation at a meeting. Again, several community members opposed the zone change, citing concerns about wildfires and evacuation difficulties. Councilmember Rodriguez stated that at issue was "what development looks like given our new realities of wildfires and the types of density that is created in certain locations [*sic*]." She recommended that the zone change be denied. The City Council

unanimously denied the zone change, stating in its written ruling that it was adopting PLUM's report.

      3.    *Snowball asks City Planning to clear map conditions because no zone change is needed under the HAA*

On January 16, 2020, about a month after City Council denied Snowball's zone change request, Snowball sent a letter to City Planning requesting that City Planning "accept and process the Project's approved Vesting Tentative Tract Map for clearance of conditions required for Final Map approval." Snowball asserted that under part of the HAA, section 65589.5(j)(4), no rezoning of the site was required.[3]

Section 65589(j)(4), which became effective on January 1, 2019, limits the circumstances in which a local agency may require a zone change. That subdivision states, in relevant part, "For purposes of this section, a proposed housing development project is not inconsistent with the applicable zoning standards and criteria, and shall not require a rezoning, if the housing development project is consistent with the objective general plan standards and criteria but the zoning for the project site is inconsistent with the general plan."

For context, we note that the City's general plan includes multiple community plans.[4] One of these plans is the Sunland-

---

[3]    Snowball also cited section 65589.5(j)(4) in its letter to the City Council on December 11, 2019, but it did not assert then that no zone change was required.

[4]    A general plan may be "a single document or . . . a group of documents relating to subjects or geographic segments of the planning area." (§ 65302, subd. (b).) Here, the City's general plan includes a Framework Element, which is "a guide for

11

Tujunga-Lake View Terrace-Shadow Hills-East La Tuna Canyon Community Plan (the community plan), which incorporates the site of Snowball's proposed project.  For purposes of this case, consistency with the community plan equates to consistency with the general plan, so these terms are sometimes used interchangeably.

General or community plans typically identify "land use designations," such as commercial, industrial, or open space, which are identified on a community plan's land use map.  Here, the land use designations for the site of Snowball's proposed project are Low Residential and Low Medium I.

For each land use designation in the relevant community plan, the community plan's land use map lists "corresponding zones." The corresponding zones listed for Low Residential are RE9, RS, R1, and RU; the corresponding zones listed for Low Medium I are R2, RD3, RD4, RD5, RD6, RZ3, RZ4, RU, and RW1. These lists include Snowball's requested new zones of R1, which allows one-family dwellings (see LAMC § 12.08), and RD5, which typically allows one-family, two-family, or multiple-family dwellings.  (See LAMC § 12.09.1.)  However, the community plan includes a limitation that development in this hillside area "shall be detached housing."  Notably, these lists of corresponding zones *do not* include the current zones for the site—RA and A1.

In its letter to City Planning, Snowball argued that the rezoning exemption in section 65589.5(j)(4) "authorizes proposed housing developments like this one to override local zoning codes

communities to implement growth and development," and a Land Use Element, consisting of 35 community plans based on geographic location.

12

that are inconsistent with the general plan." It asserted that because its project was consistent with the corresponding zones in the community plan, it did not require rezoning because "the zoning for the Project site is inconsistent with the general plan."

On May 8, 2020, City Planning denied Snowball's request in a letter. It noted that Snowball's project had been approved on the condition of a zone change, so in the absence of a zone change, the project could only go forward with "the number of dwelling units . . . permitted by the existing A1-1 and RA-1 Zones." City Planning rejected Snowball's assertion that the current zones of RA and A1 were "inconsistent" with the community plan. It stated that even though zones RA and A1 were not expressly listed as corresponding zones on the land use map, they were incorporated into the community plan by Footnote 23 of that plan, which states that each land use category includes the zones expressly listed, as well as any "more restrictive" zones not listed. Because zones RA and A1 are more restrictive than those listed in the community plan according to the LAMC, those zones were incorporated by reference through Footnote 23. The City therefore concluded that section 65589.5(j)(4) did not exempt the project from a zone change, because the zoning for the project site was not "inconsistent" with the plan. City Planning therefore denied Snowball's request.

## B.     Trial court proceedings

### 1.     *Petition for writ of mandate*

Snowball filed a petition for writ of mandate and complaint for damages on February 24, 2020.[5] It asserted five claims: (1)

---

[5] The writ petition was filed before City Planning responded to Snowball's January 2020 letter. Snowball alleged in the writ

Snowball was entitled to a writ of mandate under Code of Civil Procedure section 1085 due to City Planning's refusal to process the map clearances; (2) Snowball was entitled to a writ of mandate under Code of Civil Procedure section 1085 due to City Council's denial of the zone change; (3) Snowball was entitled to a writ of mandate under Code of Civil Procedure section 1094.5 because City Council violated the HAA in requiring a rezoning; (4) a cause of action for inverse condemnation; and (5) a cause of action for violation of civil rights under 42 U.S.C. section 1983. The two final causes of action are not relevant for purposes of this appeal.

Snowball argued that under section 65589.5(j)(4)'s rezoning exemption no zone change was required for the project, and therefore City Planning's refusal to clear the map conditions in 2020 violated the HAA.[6] Snowball contended that the project "is entitled by law to go forward . . . without a zone change."  It argued that the City had a ministerial duty to clear the map conditions.  Snowball further contended that City Council's denial of the zone change "was arbitrary and capricious and

petition that City Planning "continue[s] to refuse to process clearances for Snowball's Vesting Map."

[6]      Snowball also argued that the City's actions violated section 65905.5, which addresses how many hearings a city or county may hold after a housing project application is deemed complete.  (§ 65905.5, subd. (a).)  Snowball cited language in the statute identical to section 65589.5(j)(4) in defining circumstances in which a housing project "shall not require a rezoning." (*Id*., subd. (c).)  Because the number of hearings after approval are not at issue in this case, we do not include this statute in our discussion.

totally lacking in evidentiary support." Snowball argued that City Council's "action violated State law which requires the City to bring its zoning into consistency with its general plan. Government Code §65860 provides that 'city zoning ordinances shall be consistent with the general plan of the . . . city . . . .'"

Snowball also asserted that "the City Council's actions constitute abuse of discretion by the City in that the decision of the City to deny the Vesting Zone Change was not supported by valid findings required by Los Angeles Municipal Code §12.32.Q(3)(a)(2)(ii) and the Housing Accountability Act at Government Code §65589.5(j)(1)(A) and (B)." Snowball sought a writ of mandate under Code of Civil Procedure sections 1085 and 1094.5, attorney fees, and damages for the two causes of action.

2.    *Snowball's opening brief*

In its opening brief supporting the writ petition, Snowball argued there had been a "twelve-year entitlement process for a housing development project that the City itself stated in express written findings complies with all applicable, objective general plan and other land use regulations, policies and standards." Snowball noted that section 65589.5(j)(4) states that a project "shall not require a rezoning" where "the housing development project is consistent with the objective general plan standards and criteria but the zoning for the project site is inconsistent with the general plan." (§ 65589.5(j)(4).) Snowball argued that because the current zoning for the project site—RA and A1—was inconsistent with the community plan, and the proposed new zoning—RD5 and R1—would be consistent with the community plan, the project did "not require a rezoning."

Snowball relied on the City's July 2019 corrected determination letter, which stated, "The existing Plan designates

15

the entire subject site with multiple land use designations including Low Medium I with corresponding zones of R2, RD3, RD4, RD5, RD6, RZ3, RZ4, RU, and RW1, [and] Low with corresponding zones of RE9, RS, R1, and RU . . . ." Snowball argued that because RA and A1 were not listed as corresponding zones in the community plan, changing the zones to RD5 and R1 would take the property "from a zoning designation inconsistent with the General Plan to one that is consistent."

Snowball also argued that because it was exempt from rezoning, City Planning's "refusal to perform its ministerial duty to process Snowball's Map clearances" was "in violation of the law." Snowball asserted it was entitled to a writ of mandate under Code of Civil Procedure section 1085.

Snowball contended in the alternative that the City Council's denial of the zone change request constituted an abuse of discretion under the HAA and the LAMC because it "was arbitrary and capricious and totally lacking in evidentiary support." Snowball argued that the City was required to make certain findings under the HAA, relying on section 65589.5(j)(1), which requires a local agency to support denial of a project with "written findings" that the project "would have a specific, adverse impact upon the public health or safety" and "[t]here is no feasible method to satisfactorily mitigate or avoid the adverse impact." (§ 65589.5(j)(1).) Snowball argued that the City failed to make these required findings, and the City's letter communicating the denial, which relied on the letter from Councilmember Rodriguez, does not "contain any findings of fact at all." Snowball further asserted that the City acted in bad faith by denying the zone change, and as a result, under the HAA "the Court is empowered to enter an 'order or judgment directing the

16

[City] to approve the housing development project.' § 65589.5(k)(1)(A)(ii)."

Regarding the LAMC, Snowball argued, "LAMC §12.32.Q(3)(a)(2)(ii) requires that, when denying a vesting zone change, the City Council must find that 'the zone change is denied because it is not in substantial conformance with the purposes, intent or provisions or the General Plan or is not in conformance with public necessity, convenience, general welfare and good zoning practice and the reason for not conforming with the plan.'" Snowball argued that the only "evidence" cited was Rodriguez's letter, which "states only opinion and speculation without any attempt to cite to evidence in the record, let alone substantial evidence, in support." Snowball further argued that this opinion contradicted evidence in the City's 2019 determination letter that the required fire mitigation measures adequately addressed any fire safety concerns.

3. *The City's opposing brief*

In its opposing brief, the City argued that Snowball was not entitled to the relief it requested under the HAA. The City stated that "Section 65589.5(j)(4) excuses a zone change where the zone is inconsistent with the General Plan; but no inconsistency exists here." The City stated that the rezoning exemption did not apply to Snowball's project, because the current zoning for the project site was *consistent* with the general plan and community plan.

As in its May 2020 letter, the City relied on Footnote 23 of the community plan. Footnote 23 states in full, "Each Plan category permits all indicated corresponding zones as well as those zones referenced in the Los Angeles Municipal Code (LAMC) as permitted by such zones unless further restricted by adopted Specific Plans, specific conditions and/or limitations of

17

project approval, Plan footnotes or other Plan map or text notations.  Zones established in the LAMC subsequent to the adoption of the Plan shall not be deemed corresponding to any particular Plan category unless the Plan is amended to so indicate.  It is the intent of the Plan that the entitlements granted shall be one of the zone designations within the corresponding zones shown on the Plan, unless accompanied by a concurrent Plan amendment."

The City explained that according to its interpretation of Footnote 23, a land use category's full range of corresponding zones includes not only the zones expressly listed in the community plan, but also any "more restrictive zones . . . permitted by the municipal code but not listed" on the map.  It stated that Footnote 23, incorporated into to all community plans in 1991, "memorialized long-standing interpretation policy that each plan land use category permits all listed corresponding zones, as well as those more restrictive zones referenced in the LAMC."

The City stated that therefore even though RA and A1 were not expressly listed on the land use map, those zones were nonetheless incorporated by reference because they are "more restrictive" zones.  The City argued that therefore, "Snowball fails to demonstrate a zone-General Plan inconsistency here, a prerequisite to the HAA excusing a zone change" under section 65589.5(j)(4).  The City continued, "Since the current zones are consistent with the Community Plan, the HAA . . . does not excuse the zone change required for Snowball's project.  [¶] Zone-

plan inconsistency remains an unsatisfied prerequisite to Snowball's claim."[7]

Regarding Snowball's claim that the City failed to make the requisite findings under the HAA, the City acknowledged that "Section 65589.5(j)(1) requires specified findings to deny a project that complies with objective zoning and planning standards." However, because Snowball's project did not comply with zoning standards in the absence of a zone change, the restrictions of section 65589.5(j)(1) did not apply.

The City further argued that even if written findings had been required under either the HAA or the LAMC, "The City made findings to deny the zone change on the record at the December 9, 2019 [*sic*] PLUM hearing and in the written decision adopted as the City Council's findings." The City argued these findings complied with all requirements, and the City did not act in bad faith.

4.    *Snowball's reply*

In its reply, Snowball argued that the City's reliance on the current zoning of RA and A1 violated the HAA. It stated, "[T]he HAA was amended effective January 1, 2019 to close the exact 'loophole' that the City claims exempts it from HAA compliance in this case. The City has kept the zoning for the Project site artificially low at RA-1 and A1-1 zones (which restricts density to 19 units [ ]) while the Property is designated in the General Plan

_____

[7]    The City also argued that because the City conditioned approval upon a zone change in July 2019 at the latest, and Snowball did not challenge this requirement until it filed its writ petition in February 2020, Snowball's claim was time barred under the 90-day statute of limitations in section 66499.37. That argument is not at issue in this appeal.

19

as Low Residential Low Medium I Residential (which permits density up to 244 units [ ]) in order to create a situation in which Snowball is forced to apply for a re-zoning and the City may use that opportunity to reject the housing project.  The City's claim that these restrictive zoning designations are consistent with the General Plan designation allowing significantly higher density is exactly what the amendment to the HAA was designed to prevent."

Snowball also argued that throughout the application process, the City stated that the existing zoning was *not* consistent with the general plan.  Snowball pointed to several instances in the record in which the City stated that the zone change would "bring the zoning into conformance" with the general or community plan, or would "create consistency with" the community plan's land use designations. Snowball characterized the City's interpretation of Footnote 23 as "revisionist," and "***exactly*** the type of evasion that the 2018 amendment to the HAA was designed to outlaw."

5. *The court's ruling*

Following a two-day hearing in March and April 2021, the superior court denied Snowball's petition for a writ of mandamus in a written ruling.  The court first addressed Snowball's argument under section 65589.5(j)(4).  The court discussed the parties' contentions regarding Footnote 23, noting that the City interpreted Footnote 23 to mean that "[a]pplicable community plan categories include corresponding zones as well as more restrictive zones under the City's municipal code."  The court stated, "Snowball does not provide any legal justification supporting any authority for the court to disregard Footnote 23." The court rejected Snowball's arguments about how Footnote 23

20

should be interpreted, and stated, "Snowball has not demonstrated zoning inconsistency within the City's Community Plan. As such, the HAA does not preclude the City from requiring Snowball to obtain a zone change as a condition of its approval of the Project."

Turning to the City's denial of Snowball's requested zone change, the court agreed with the City that a "zone change involves a legislative act by a municipality" and therefore judicial review was limited. The court relied on its conclusion that the HAA did not apply, and found that the City therefore was not required to comply with section 65589.5(j)(1).

The court held that in order for Snowball to succeed on its claim that the City did not comply with the LAMC, "Snowball must demonstrate the City acted arbitrarily and capriciously in denying the zone change" under LAMC standards. The court stated that the "record supports the findings set forth in [Councilmember Rodriguez's] letter and adopted by the City Council." The court noted that surrounding areas are zoned at a lower density than RD5, and there were concerns about fire safety and risks associated with the high-density project. The court concluded, "Based on the evidence before the City Council, the court finds Snowball has not demonstrated the City's denial of its vested zone change was arbitrary or capricious. . . . [T]here is a reasonable relationship between the decision denying the zone change and public necessity, convenience, general welfare and good zoning practice."

The court therefore denied Snowball's petition for writ of mandamus, and transferred the matter to address Snowball's civil causes of action for damages. The parties stipulated to the

21

entry of judgment in favor of the City, the court entered the judgment, and Snowball timely appealed.

## III. DISCUSSION

Snowball asserts three arguments. First, it contends the HAA's rezoning exemption in section 65589.5(j)(4) applied, so its project was exempt from the requirement of a zone change. Second, it contends the City failed to make the findings required by the HAA in section 65589.5(j)(1). Finally, Snowball asserts that the City failed to make findings required by the LAMC when denying the zone change. We address each of these contentions below.

### A. Standard of review

Snowball contends it is entitled to a writ of mandate under Code of Civil Procedure sections 1085 and 1094.5. Generally under Code of Civil Procedure section 1085, "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins." (Code Civ. Proc., § 1085, subd. (a).) "The petitioner must demonstrate the public official or entity had a ministerial duty to perform, and the petitioner had a clear and beneficial right to performance." (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 700.) "Normally, mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner. However, it will lie to correct abuses of discretion." (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 654.)

In addition, "'[t]he "rezoning of property, even a single parcel, is generally considered to be a quasi-legislative act" thus "subject to review under ordinary mandamus"'" under Code of

22

Civil Procedure section 1085.  (*Foothill Communities Coalition v. County of Orange* (2014) 222 Cal.App.4th 1302, 1309; see also *Yost v. Thomas* (1984) 36 Cal.3d 561, 570 ["the rezoning of land is a legislative act"].)  Review "is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support." (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 992.)

Following a writ proceeding under Code of Civil Procedure section 1094.5, the appellate court "reviews the administrative record to determine whether substantial evidence in the record supports the agency's factual findings.  The court also determines whether the findings support the agency's decision and whether the agency committed any legal error." (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1260-1261.)

Snowball urges us to apply the standard of review applicable to certain HAA rulings as articulated in *California Renters Legal Advocacy & Education Fund v. City of San Mateo* (2021) 68 Cal.App.5th 820, 837 (*California Renters*): "[I]nstead of asking, as is common in administrative mandamus actions, 'whether the City's findings are supported by substantial evidence' [citation], we inquire whether there is 'substantial evidence that would allow a reasonable person to conclude that the housing development project' complies with pertinent standards. (§ 65589.5, subd. (f)(4).)  As the public entity that disapproved the project, the City bears the burden of proof that its decision conformed to the HAA. (§ 65589.6.)."  As discussed below, however, Snowball has not demonstrated that the HAA applies here, and therefore we do not consider whether this standard applies.  Nevertheless, our conclusion would be the same under this standard.

## B.    Legal background

### 1.    *The role of general plans, the community plan, land use designations, and zoning*

"Land use regulation in California historically has been a function of local government under the grant of police power contained in article XI, section 7 of the California Constitution." (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151.)  The Legislature has also "recognized that 'decisions involving the future growth of the state . . . are made and will continue to be made at the local level.' ([§ 65030.1].)  To ensure that localities pursue 'an effective planning process' (§ 65030.1), each city and county must 'adopt a comprehensive, long-term general plan' for its own 'physical development" . . . .  (§ 65300.)" (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 152 (*Orange Citizens*).)  A general plan is required to set forth "objectives, principles, standards, and plan proposals." (§ 65302.)

The process of adopting a general plan "is structured to transcend the provincial.  Public participation and hearings are required at every stage, in order to obtain an array of viewpoints." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 571, citing §§ 65351, 65355.)  "'During the preparation or amendment of the general plan, the planning agency shall provide opportunities for the involvement of citizens, California Native American Indian tribes, public agencies, public utility companies, and civic, education, and other community groups, through public hearings and any other means the planning agency deems appropriate.' (§ 65351.)  A legislative body must refer its proposal to a number of listed public entities before adopting or amending a general plan. (§ 65352.) Planning

commissions must hold at least one public hearing and make a written recommendation to the legislative body; legislators must hold at least one public hearing before acting on the recommendation.  (§§ 65353-65356; see § 65354.5 [a planning agency authorized to approve or amend a general plan must 'establish procedures for any interested party to file a written request for a hearing by the legislative body' and must provide public notice of any hearings].)"  (*Orange Citizens, supra,* 2 Cal.5th at pp. 152-153.)

"Because of its broad scope, long-range perspective, and primacy over subsidiary land use decisions, the 'general plan has been aptly described as the 'constitution for all future developments' within the city or county.'"  (*Orange Citizens, supra,* 2 Cal.5th at p. 152.)  Thus, ""[t]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.""" (*Id.* at p. 153.) This consistency is also imposed by statute: "County or city zoning ordinances shall be consistent with the general plan of the county or city . . . ."  (§ 65860, subd. (a).) Notably, a city's general plan and its zoning need not be identical; a zoning ordinance is "consistent with a city or county general plan" if the "various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in the plan."  (§ 65860, subd. (a)(2).)

     2.    *The HAA*

The HAA, section 65589.5, reflects the Legislature's attempts to address California's "housing supply and affordability crisis."  (§ 65589.5, subd. (a)(2)(A).)  As originally enacted in 1982, section 65589.5 made clear that it applies

"[w]hen a proposed housing development project complies with the applicable general plan, zoning, and development policies in effect at the time that the housing development project's application is determined to be complete." (See *Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1074.) This language was later moved into section 65589.5(j)(1) (*ibid*.), which is discussed below.

In 2018 revisions to the statute, the Legislature stated that its "intent in enacting [the HAA] in 1982 and in expanding its provisions since then was to significantly increase the approval and construction of new housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing development projects and emergency shelters." (§ 65589.5, subd. (a)(2)(K).) The statute further states, "It is the policy of the state that this section be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing."[8] (*Id*., subd. (a)(2)(L).)

## C. Section 65589.5(j)(4)

Snowball's primary contention under the HAA is that its housing project was entitled to the rezoning exemption in section 65589.5(j)(4). That subdivision states in relevant part that "a proposed housing development project is not inconsistent with the applicable zoning standards and criteria, and shall not require a rezoning, if the housing development project is

---

[8]    Much of the HAA and related statutes focuses on housing for very low, low-, and moderate-income households. The project at issue in this case does not involve this type of housing.

consistent with the objective general plan standards and criteria *but the zoning for the project site is inconsistent with the general plan.*" (Emphasis added.) The parties agree that aside from the rezoning issue, Snowball's proposed project conforms to objective plan standards and criteria. Thus, the crux of the parties' disagreement lies with the italicized portion quoted: whether the current zoning for the project site is "inconsistent" with the general plan. Snowball argues that the current zoning is inconsistent with the general plan, and therefore section 65589.5(j)(4) exempts it from any rezoning requirement. The City disagrees, asserting that the current zoning is *consistent* with the general plan, and therefore section 65589.5(j)(4) has no effect here.

1.     *The community plan and Footnote 23*

As noted above, the relevant portion of the general plan, the community plan, has various land use designations displayed on its land use map; the land use designations for Snowball's project site are Low Medium I (most of the site) and Low Residential (a small part of the site). The map includes a list of corresponding zones for each land use designation. The Low Medium I designation lists as corresponding zones R2, RD3, RD4, RD5, RD6, RZ3, RZ4, RU, and RW1; the Low Residential designation lists as corresponding zones RE9, RS, R1, and RU.

The current zones for the site are A1 and RA. Snowball and the City agree the community plan does not expressly include zones A1 and RA in the list of corresponding zones for the relevant land use areas. Snowball argues this means zones RA and A1 are inconsistent with the community plan, and that "[e]xisting zoning that allows no more than 19 homes is not consistent with the Community Plan designation that allows up

27

to 244 homes," the amount that would be allowed if the area were developed at maximum density under RD5.  The City contends that even though A1 and RA are not expressly listed as corresponding zones, those zones are consistent nevertheless because they have been incorporated by reference through the text of the community plan and Footnote 23 of the land use map.

The community plan, under the heading "Plan Consistency," states, "For each plan category, the Plan permits all identified corresponding zones, as well as those zones which are more restrictive, as referenced in Section 12.23 of the Los Angeles Municipal Code (LAMC)."[9]  Footnote 23, according to the City, also "explains that the RA and A1 zones are corresponding zones for the Low Medium I and Low Residential land use categories."

As noted above, Footnote 23 states in part, "Each Plan category permits all indicated corresponding zones as well as those zones referenced in the Los Angeles Municipal Code (LAMC) as permitted by such zones unless further restricted by adopted Specific Plans, specific conditions and/or limitations of project approval, Plan footnotes or other Plan map or text

---

[9]     LAMC 12.23 (B)(7) states, "Change of Use.  (a) Any change of use of a building or a portion of a building must conform to the current regulations of the zone and other applicable current land use regulations.  (b) However, in the R, C, or M Zones, a nonconforming use may be changed to any use that is permitted in a more restrictive zone than the current zone.  The sequence of these zones, the first being the most restrictive and the last being the least restrictive, is as follows: OS, A1, A2, RA, RE, RS, R1, RU, RZ, RW1, R2, RD, RMP, RW2, R3, RAS3, R4, RAS4, R5, CR, C1, C1.5, C4, C2, C5, CM, MR1, M1, MR2, M2, M3 and PF. . . ."

notations." The trial court aptly commented in its written ruling that "Footnote 23 is not a model of clarity." However, the history of Footnote 23 offers an explanation as to its intended meaning.

A version of Footnote 23 was proposed by the City Council in 1990 to comply with the requirement that the City's zoning comply with its general plan. To achieve compliance through rezoning, zoning for approximately 8,000 parcels in the City would have to be changed. Rather than achieving consistency by upzoning these 8,000 parcels to higher intensity zones, the City effectively amended its community plans to incorporate the existing zoning.

City Council's initial proposal in 1990 was that "a plan amendment footnote be added to all community plans stating in effect that: [¶] The plan categories permit all zoning that is more restrictive (as set forth in Sec. 12.23 of L.A.M.C.) than those indicated unless otherwise restricted by Zoning Code, specific conditions of approval or other provision of the community plan."

A City Planning memorandum stated that after the original footnote was proposed, staff rewrote it. The memorandum stated, "Staff has modified the language contained in the motion to be more precise," and "Staff has reviewed the intent of the Council language and redrafted it to read more accurately and to take into account various nuances contained in the Zoning Code." The recommended revised footnote constituted the first two paragraphs of what eventually became Footnote 23. The Planning Department memo noted that the addition of the footnote would not effect a material change, stating, "The corresponding zones section [in community plan legends] has not included all more restrictive zones although the plans have been interpreted consistently over the years to mean generally that

the more restrictive zones are consistent with the applicable plan category."

A January 10, 1991 memorandum from the Director of Planning to City Planning stated that "[t]he Commission, after some discussion, instructed staff to provide stronger rationale for the proposed amendment and to modify the language to establish greater certainty about future zoning." A bullet point list titled "Rationale For The Amendment" stated in part, "Zones more restrictive than those shown in the Plan category are consistent with [the] plan . . ." and "Except in rare instances . . . [a] property owner would not apply for downzoning" to a more restrictive zone. A proposed third paragraph was therefore added to "supplement" the prior version of the footnote: "It is the intent of the Plan that the entitlements granted shall be one of the zone designations within the corresponding zones shown on the Plan, unless accompanied by a concurrent Plan amendment."

In a February 12, 1991 letter, then-mayor Tom Bradley recommended the City adopt the footnote, which would "clarify that zones more restrictive than those shown in the legend are consistent with the plan." In March 1991, the City adopted the footnote as recommended.

Relying on Footnote 23 and its history, the City argues that the current zoning of the site—RA and A1—is consistent with the general and community plans. The City points out that LAMC identifies RA and A1 as "more restrictive" than RD5. (See LAMC §§ 12.04.A, 12.23.B.7(b).) The community plan categories therefore include the listed corresponding zones, as well as more restrictive zones, such as RA and A1. And because the rezoning exemption in section 65589.5(j)(4) applies when "the zoning for

30

the project site is inconsistent with the general plan," the rezoning exemption does not apply here.

Snowball disagrees that Footnote 23 can render "all more restrictive zones . . . magically consistent." In essence, Snowball's contention comes down to an argument that the City, in drafting its community plan, was required to *expressly list* each corresponding zone for each land use designation, rather than incorporate other zones by reference. We are not persuaded. The Legislature provides great deference to cities in developing their general plans: "The general plan may be adopted in any format deemed appropriate or convenient by the legislative body." (§ 65301, subd. (a); see also *Orange Citizens*, *supra*, 2 Cal.5th at p. 157 ["A city may enact a general plan in any form it chooses"].) Moreover, "[t]he adoption or amendment of a general plan is a legislative act" which is "presumed valid." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195, citing § 65301.5.) Even if we disagreed with the wisdom or clarity of the City's choice to incorporate more restrictive zones by reference into the community plan rather than explicitly listing them, we cannot substitute our judgment for the City's. (See *id.* at p. 1196 ["the city has broad discretion to weigh and balance competing interests in formulating development policies, and a court cannot review the wisdom of those decisions under the guise of reviewing a general plan's internal consistency and correlation"].)

Snowball also disagrees with the City's interpretation of Footnote 23. It argues that the City is relying on a "revisionist" contention that zones RA and A1 are consistent, and is making a "post-hoc assertion that the HAA does not apply." Snowball argues that "at every stage of the Project's 14-year entitlement

31

process," the City took the position that the existing zoning for the site was inconsistent with the general plan. It points to numerous documents from the City, such as the Vesting Tentative Tract Map Findings of Fact and Vesting Zone Change Findings of Fact, which included statements such as, "The zone change would bring the zoning into conformance with the residential land use designation of Low Medium I," and "The recommended zone change . . . would create consistency with the respective land use designations of Low Medium I and Low Residential." Snowball argues that the City therefore "made numerous unappealed, unlitigated, final findings" showing that "the City itself found that the existing zoning was not consistent with the general plan designation."

Snowball's complaints about the City's "revisionist" and "post-hoc" arguments are not supported by the record. Snowball requested a zone change in 2007, and section 65589.5(j)(4) became effective on January 1, 2019. Snowball first asserted it was entitled to the rezoning exemption in section 65589.5(j)(4) *after* the City Council denied the zone change in December 2019. Nothing in the record suggests the City had any reason to express an opinion as to whether the site's *existing* zoning was consistent with the community plan before Snowball asserted this argument in its letter to City Planning in 2020.

Snowball also points to the language of the third paragraph of Footnote 23, which states that "entitlements granted shall be one of the zone designations within the corresponding zones shown on the Plan." It argues that this language "*supports* Snowball's argument that zones more restrictive than the corresponding zones listed in the plan, such as the existing zones on the Property, are *not* consistent with the general plan

designations, and per Footnote 23's last paragraph, *must* be upzoned to one of the listed corresponding zones to achieve consistency when, as here, a project is proposed."

We disagree with Snowball's interpretation. The fact that entitlements, once granted, must be consistent with the general plan does not speak to whether more restrictive zones—such as RA and A1, which existed at the time the relevant plans were adopted—may constitute corresponding zones under the relevant plans. Moreover, Footnote 23 does not state that zoning must be changed if a project is simply *proposed*, as Snowball suggests.

2. *Case law*

Snowball argues that *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531 (*Lesher*), supports its position. In that case, the City of Walnut Creek had a general plan that was "growth oriented," which specifically stated that traffic congestion should not be an impediment to growth. (*Id.* at p. 536.) An initiative passed by voters, Measure H, created a building moratorium linked to certain levels of traffic congestion. (*Id.* at pp. 536-537.) The plaintiffs challenged the validity of Measure H on the grounds that it was inconsistent with the city's general plan. (*Id.* at p. 537.) The Supreme Court held that "Measure H is an ordinance in the nature of a zoning ordinance," and "[a] zoning ordinance that conflicts with a general plan is invalid at the time it is passed." (*Id.* at p. 544.) The court concluded, "Since Measure H was inconsistent with the plan in effect when Measure H was adopted, the measure is invalid." (*Id.* at p. 545.)

Snowball argues that the reasoning of *Lesher* applies here, because the existing zoning of the project site allows 19 homes, while the land use designation in the community plan allows up

33

to 244 homes.  However, no conflicting zoning ordinance was passed *after* the adoption of the general plan, which was what rendered Measure H invalid in *Lesher*.  To the contrary, the project site at issue here apparently was zoned A1 and RA before the general and community plans were adopted.

Snowball also relies on a nonpublished case, *Warner Ridge Associates v. City of Los Angeles* (Dec. 31, 1991, B052835, ordered nonpub. Mar. 12, 1992) (*Warner Ridge*), asserting that it can be considered for its collateral estoppel[10] effect on the City, and that the reasoning of it should apply here.  In *Warner Ridge*, a 21.5-acre parcel of real property in the Woodland Hills area of Los Angeles was zoned RA and A1 in 1969.  (*Id* at p. 308.)  In 1984, the City adopted a district plan designating the property for commercial development as "neighborhood and office," with corresponding zones of CR, C1, C1.5, C4 and P.  (*Id* at p. 309.)  A portion of the district plan addressed Warner Ridge specifically, and authorized "a Specific Plan for Warner Ridge to provide for the development of the site with office commercial uses."  (*Ibid*.)

Plaintiff WRA purchased the parcel in 1985, proposed a project, and sought a zone change to C4.  (*Warner Ridge, supra,* at p. 309.)  After several years of WRA working through the approval process, in 1990 the City rejected WRA's project and passed a new zoning ordinance that "designated the property (T)RS–1 (residential suburban).  That zoning allows single family residences on large estate sized lots (minimum 7,500 square

---

10	California courts "now refer to 'claim preclusion' rather than 'res judicata' [citation], and use 'issue preclusion' in place of 'direct or collateral estoppel.'"  (*Samara v. Matar* (2018) 5 Cal.5th 322, 326.)

feet)." (*Id.* at p. 310.)  WRA filed a petition for writ of mandate, seeking to compel the City to make the zoning consistent with the general plan, as required by section 65860.  Relying on *Lesher*, the Court of Appeal reasoned, "Because residential suburban zoning prohibits the category of use contemplated in the General Plan, it is inconsistent with the General Plan and was invalid when passed." (*Id.* at p. 315.)  In its conclusion, the court again stated, "The residential suburban zoning enacted by the City is not consistent with the General Plan.  The ordinance, therefore, was invalid when passed." (*Id.* at p. 317)

The *Warner Ridge* court commented on the City's "hierarchy theory" regarding zoning, in which all less intensive land uses are permitted within any zone.  (*Warner Ridge, supra,* at p. 315.)  As *Warner Ridge* was decided in 1991, the court acknowledged the recent addition of Footnote 23 and others like it, stating that the City had "attempted to set its hierarchy theory in concrete by adding an amendment to each of the 35 District Plans which make up the land use element of the City's General Plan." (*Warner Ridge, supra*, at p. 315)  The *Warner Ridge* court rejected the hierarchy theory, stating, "The hierarchy theory would grant the City the authority to *prohibit* an entire category of land use which is specifically *permitted* and envisioned by the General Plan. However, the City cannot pass a zoning ordinance which is inconsistent with the General Plan.  Such zoning is invalid *when enacted*.  Thus, the hierarchy theory improperly would allow the City to amend its General Plan through the enactment of inconsistent zoning ordinances." (*Ibid.*)[11]

---

[11]     Notably, the 1990 zoning ordinance in *Warner Ridge* also may have violated the third paragraph of Footnote 23, which

The *Warner Ridge* court continued, "A general plan which designates property for intense development with the contemplation that designation may thereafter be prohibited through zoning is, in effect, no general plan . . . . Such a general plan certainly does not comport with the concept of a charter for land use which should provide guidance, continuity and stability. The hierarchy theory, in essence, repeals the consistency requirement. [¶] In order for zoning to be consistent with the General Plan, at minimum, it cannot prohibit an entire category of use which is permitted by the General Plan. Whether a less intense use is included within a more intense use, or whether such a use may be permitted is beside the point." (*Warner Ridge, supra,* at pp. 315-316.)

We disagree that the *Warner Ridge* holding has a preclusive effect here. "[I]ssue preclusion applies: (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 825.) "The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342.) Thus, "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot be relitigated . . . in a

_____

states that "entitlements granted shall be one of the zone designations within the corresponding zones shown on the Plan." The corresponding zones shown on the district plan were CR, C1, C1.5, C4 and P, but the new zone was (T)RS—not one of the zones listed on the plan.

36

future lawsuit." (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 249.)

The case before us presents a different scenario than that in *Warner Ridge*. Here, the current zoning for the property allows single-family residential use at a density of 19 homes for the site. The community plan also allows only single-family residential use, but at a density of up to 244 homes. Thus, the City's "hierarchy theory" does not "prohibit an entire category of use which is permitted by the General Plan," as in *Warner Ridge*.[12] Instead, it allows the exact same category of use—single-family residential—but at a lower density. For this reason, *Warner Ridge* does not present an identical issue that was actually litigated in the earlier lawsuit.

Furthermore, the reasoning of *Warner Ridge* implicitly relied on the City's goals and intentions for the parcel, as expressed in the general and district plan, which were to allow the area to be developed for commercial use. Here, by contrast, there is no suggestion that this area was targeted for growth at a particular density. A zoning ordinance is consistent with a general plan when "[t]he various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in the plan." (§ 65860, subd.

---

[12] Although zone A1 is sometimes referred to as "agricultural," chapter 3 of the Framework Element, titled "Land Use," notes that "single family residential" includes all zones at issue here: A1, RA, R1, and RD5. (See General Plan, Framework Element, p. 3-16.) Over Snowball's objection, we take judicial notice of the Framework Element. (Evid. Code, § 452, subd. (b), (c); 459.) The parties' remaining requests for judicial notice filed on July 31, 2023 are denied.

(a)(2).)  Here, unlike in *Warner Ridge*, allowing only limited residential density does not sharply contrast with the objectives, policies, and land uses specified in the general and community plans.

> 3.      *Section 65589.5(j)(4) does not mandate maximum density*

Snowball and amici[13] assert that limiting density to anything below the maximum permitted in the community plan necessarily renders the zoning "inconsistent" or otherwise triggers the rezoning exemption in section 65589.5(j)(4). Snowball asserts that "the existing zones that allow only 19 homes . . . are inconsistent with plan designations allowing up to 244 homes." Amicus YIMBY argues, "If the general plan specifies a greater density than allowed by the zoning, the zoning is by definition inconsistent with the general plan," so no zone change is needed under section 65589.5(j)(4).  Amici Californians for Homeownership et al. similarly contend that a city should not be allowed to "use its zoning to disallow the densities that are expressly anticipated in the general plan."  And amicus California Building Industry Association asserts that under section 65589.5(j)(4), any time a project requires a zone change, the zoning should be deemed inconsistent: "[R]equiring a rezoning of a plan-consistent project informs whether 'the zoning for the project [site] is inconsistent with the general plan."

---

[13]      We granted requests to file three amicus briefs submitted by (1) the California Building Industry Association; (2) Californians for Homeownership and the California Association of Realtors; and (3) Yes In My Back Yard (YIMBY).  The City filed a response brief.

38

The City counters that these concepts of consistency and inconsistency are not supported by law. We agree. First, there is no support for defining "inconsistent" to mean any zoning other than maximum density. Such a definition would conflict with the statement in section 65860, subdivision (a)(2) that zoning is "consistent" with a general plan if the "various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in the plan." In addition, the community plan itself states that development standards "applicable to specific areas and parcels of land" will be informed by not only "the Zoning Map" but also the applicable "Zoning Ordinance."

Moreover, under the logic of the maximum density arguments, even expressly listed zones could be considered "inconsistent" with the community plan. For example, even if the site for Snowball's project was zoned RD4—a corresponding zone expressly listed on the land use map—the site zoning would be deemed "inconsistent" with the general plan because Snowball's project required a zone change to RD5. We do not agree that a zone expressly listed in the community plan is "inconsistent" with that same community plan under section 65589.5(j)(4).

The legislative history of section 65589.5(j)(4) also contradicts the maximum density arguments.[14] In Assembly Bill

_____

[14] When the language of a statute is clear, courts must follow its plain meaning; courts generally resort to other aids, such as legislative history and public policy, only where the statutory language permits more than one reasonable interpretation. (See, e.g., *Los Angeles Unified School Dist. v. Superior Court* (2023) 14 Cal.5th 758, 768.) We find no ambiguity in the first sentence of

39

3194 (2017-2018 Reg. Sess.) (A.B. 3194), which became section 65589.5(j)(4), the Legislature proposed—and eventually rejected—language that would have required local authorities to approve projects if they were within the maximum allowable density of a general plan.  The proposed statute, as introduced on February 16, 2018, stated, "For purposes of this section, a housing development project shall not be found inconsistent, not in compliance, or not in conformity, with the applicable zoning ordinance, and the project shall not require a rezoning, *if the existing zoning ordinance does not allow the maximum residential use, density, and intensity allocable on the site by the land use or housing element of the general plan*."  (Emphasis added.)

Local government organizations opposed the bill.  The Rural County Representatives of California, the Urban Counties of California, and the California State Association of Counties (collectively, RCRC) stated in a letter expressing their opposition, "AB 3194 would prohibit a local government from requiring a rezoning of a project site if the existing zoning does not allow the maximum residential use, density, and intensity allocable on the site by the land use or housing element of the General Plan.  The General Plan and the land use element were never intended to be as specific as a zoning ordinance – rather, they are designed to provide the flexibility necessary for coherent long-term planning." (Letter from RCRC to Assembly Member Tom Daly, Apr. 18, 2018.)  The letter stated that requiring maximum planned densities in all cases "could drastically increase allowed densities

---

section 65589.5(j)(4).  We refer to its legislative history here only to address Snowball and amici's arguments.

in areas that are either inappropriate or not planned for more intensive residential development." (*Ibid*.)

Through a series of amendments, the Legislature changed the bill to exclude the language requiring maximum allowable density, replacing it with the language as it exists today— requiring only consistency with each locality's general plan. RCRC then removed their opposition to the bill, reasoning that the bill as amended "will be limited to circumstances where the jurisdiction has not brought its zoning ordinance into conformity with the general plan – which is something that is ultimately under the jurisdiction's control." (Letter from RCRC to Assembly Member Tom Daly, June 13, 2018.)

We also disagree with the maximum density arguments because requiring maximum allowable density at any particular site would be *inconsistent* with the City's general plan. For example, the Framework Element of the general plan states, "[I]f all lands were to be developed with the uses at the maximum densities permitted, an unrealistic jobs/housing relationship would result and supporting infrastructure and public services would be unable to support this level of growth." (General Plan, Framework Element, p. 2-1.) The general plan also "proposes incentives to encourage whatever growth that occurs to locate in neighborhood districts, commercial and mixed-use centers, along boulevards, industrial districts, and in proximity to transportation corridors and transit stations." (General Plan, Framework Element, p. 3-1.) And as Councilmember Rodriguez pointed out in her letter to PLUM, the project site is not within the City's Regional Housing Needs Assessment.

Thus, we do not read section 65589.5(j)(4) to require the highest allowable density for a given site. That interpretation

41

would contradict both the Legislature's intent and the City's general plan.[15]

### 4. *HAA policy and intent*

Snowball and amici further assert that the City is violating the spirit of the HAA by relying on inconsistent, low-density zoning to deny this housing project. Again relying on the legislative history of A.B. 3194, Snowball points to an analysis by the Assembly Committee on Housing and Community Development (Apr. 25, 2018), which states that local authorities "can still avoid the HAA . . . by requiring project-by-project re-zonings or zoning variances even where a housing project is consistent with the housing allowed by the general plan, thus rendering housing projects beyond the scope of the HAA's protections because they are technically 'inconsistent' with the zoning for the site." Amici refer to an analysis of A.B. 3194 by the Senate Committee on Governance and Finance (June 27, 2018), which noted that "local zoning and other development standards must generally be consistent with the applicable general plan," but "some local agencies intentionally maintain inconsistencies to gain an additional measure of control over development. By maintaining low densities or height limits that are inconsistent with the general plan for the express purpose of requiring rezoning, even when projects are consistent with

---

[15] For the first time in its reply brief, Snowball argued that the second sentence of section 65589.5(j)(4) should be interpreted to mean that the rezoning exemption applies even if the zoning for the project site is *consistent* with the general plan. The City moved to strike the portions of Snowball's reply brief asserting new arguments. We granted that motion, and therefore do not address this contention.

42

housing density and other objective standards contained in the city or county's general plan, local governments can ensure that they maintain discretionary approval over projects. Locals sometimes exploit this loophole to evade compliance with the HAA, on the grounds that projects are technically inconsistent with the existing zoning standards."

Snowball and amici argue that this is exactly what the City is doing here: Despite the community plan's higher-density land use designations and corresponding zones, the City is playing a "shell game" with zoning requirements in order to skirt the requirements of the HAA.

We recognize the HAA's stated policy that it should be "interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing." (§ 65589.5, subd. (a)(2)(L).) But compliance with the HAA does not mean that every proposed project must be approved or that maximum allowable density must be allowed at every site. These arguments highlight the tensions inherent in the Legislature's efforts to solve a statewide problem that lies within a realm typically controlled by local authorities. As noted in section III(B)(1), *supra*, land use decisions have historically been a function of local government regulation under the California Constitution (see *Big Creek Lumber Co. v. County of Santa Cruz, supra*, 38 Cal.4th at p. 1151), and as recognized by statute (see § 65030.1 ["decisions involving the future growth of the state . . . are made and will continue to be made at the local level"]). The Legislature has narrowed the criteria local authorities may rely upon in denying a project. However, local control has not been abrogated by the HAA. Instead, the HAA has made clear from its inception in 1982 that it only applies

43

"[w]hen a proposed housing development project complies" with the local "general plan, zoning, and development policies." (§ 65589.5(j)(1).) And section 65589.5(j)(4) ties its rezoning exemption to the general plan, which is developed and updated by local governments based on local needs.

When the City was required to bring its zoning into compliance with the general plan, it did so not by changing the existing zoning of individual parcels, but by amending its community plans with a footnote to incorporate the existing zoning. We might deem it a poor practice to have a community plan list certain corresponding zones, yet incorporate others by reference in a footnote so opaque that delving into its 30-year history is required to parse its meaning. But the question before us is not whether the construction of the community plan is poorly phrased or unwise. The adoption or amendment of a general plan is a legislative act which is presumed valid. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra*, 126 Cal.App.4th at p. 1195.) "[T]he city has broad discretion to weigh and balance competing interests in formulating development policies, and a court cannot review the wisdom of those decisions under the guise of reviewing a general plan's internal consistency and correlation." (*Id*. at p. 1196.)

Instead, our task is to determine whether Snowball is entitled to the rezoning exemption in section 65589.5(j)(4) as the Legislature has written that subdivision. The current RA and A1 zoning is consistent with the community plan through the language of that plan, including Footnote 23. Because the rezoning exemption in section 65589.5(j)(4) only applies when "the zoning for the project site is inconsistent" with the applicable plan, the rezoning exemption in section 65589.5(j)(4) does not

44

apply here, and Snowball's project was not exempt from zone change requirements.

**D.     Section 65589.5(j)(1)**

Snowball also contends that when the City denied the zone change, it failed to make the findings required by section 65589.5(j)(1), which sets out certain findings a local agency must make when denying a housing project.  That subdivision states, in full,

> "When a proposed housing development project complies with applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards, in effect at the time that the application was deemed complete, but the local agency proposes to disapprove the project or to impose a condition that the project be developed at a lower density, the local agency shall base its decision regarding the proposed housing development project upon written findings supported by a preponderance of the evidence on the record that both of the following conditions exist:

> "(A) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density.  As used in this paragraph, a "specific, adverse impact" means a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete.

45

"(B) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to paragraph (1), other than the disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density."

(§ 65589.5(j)(1).) Snowball argues the City was required to make the findings in parts (A) and (B), in "written findings supported by a preponderance of the evidence."

The City points out that by its express terms, section 65589.5(j)(1) applies when "a proposed housing development project complies with applicable, objective general plan, *zoning*, and subdivision standards and criteria . . . in effect at the time that the application was deemed complete." (§ 65589.5(j)(1), emphasis added.) The City asserts that because Snowball's project did not comply with the current zoning—it required a zone change—section 65589.5(j)(1) does not apply. Snowball does not disagree that section 65589.5(j)(1) includes this requirement, but states that under section 65589.5(j)(4), the project should be "treated as though it has been rezoned."

The plain language of section 65589.5(j)(1) states that a local agency is required to make written findings only when the proposed project "complies with applicable . . . zoning . . . in effect at the time that the application was deemed complete." (§ 65589.5(j)(1).) As noted in section III(C), supra, this language was in section 65589.5 when it was originally enacted; the HAA has always applied only to projects that comply with local zoning. Snowball's project did not meet that criteria because it did not comply with the applicable zoning; it required a zone change. And for the reasons discussed in the previous section, we do not

46

agree that the project fell under the rezoning exemption in section 65589.5(j)(4).  Snowball therefore has not demonstrated that the City was required to comply with section 65589.5(j)(1).

**E.     LAMC**

In a very brief argument, Snowball also contends the City abused its discretion in denying Snowball's zone change request "based on invalid findings under its own code which were also lacking evidentiary support."  Snowball argues that "the City Council's action was arbitrary and capricious and totally lacking in evidentiary support as it was not supported by the valid findings required by LAMC §12.32.Q(3)(a)(2)(ii), and the inadequate findings by the City were not supported by substantial evidence in the record."  Snowball asserts that record evidence shows that the planned mitigation measures would alleviate any fire safety concerns.  Snowball contends it is therefore entitled to a writ of mandate under Code of Civil Procedure, section 1094.5.  The City argues that LAMC section 12.32(Q)(3)(a)(2) does not require specific findings to deny a proposed zone change, and even if it did, the City Council made such findings on the record.

LAMC section 12.32(Q)(3)(a)(2) states that "a vesting zone change may be conditioned or denied if the City Planning Commission or the City Council determines . . . (ii) the zone change is denied because it is not in substantial conformance with the purposes, intent or provisions of the General Plan or is not in conformance with public necessity, convenience, general welfare and good zoning practice and the reason for not conforming with the plan.  [¶] If the Council does not adopt the Commission's findings and recommendations, the Council shall make its own findings."

47

The City points out that the LAMC also requires it to make affirmative findings to *grant* a zone change. Under the LAMC section 12.32(C)(7), the City Council may "approve an ordinance only after making findings that its action is consistent with the General Plan and is in conformity with public necessity, convenience, general welfare and good zoning practice." Councilmember Rodriguez cited this subdivision in her letter, stating, "Pursuant to Section 12.32-C of the Los Angeles Municipal Code, findings of fact must be made in the affirmative in order to recommend an action to be consistent with public health and safety, general welfare, and good zoning practice." As discussed above, Rodriguez concluded that such findings could not be made.

As noted above, PLUM stated that it "adopted the findings presented by Council District 7 as the findings of the PLUM Committee," and the City Council in its written ruling adopted PLUM's report. Snowball argues that the "findings" of the City Council therefore consisted only of those in Rodriguez's letter, which were "opinion and speculation," and were "not based on any facts in the record, [so] they are not sufficient to support the City's action."

We disagree. The evidence before both PLUM and the City Council included City Planning's findings, Rodriguez's letter, hundreds of pages of written comments and attachments submitted by members of the public, a letter from a state senator, a petition signed by more than 2,000 people, oral comments made by members of the public at the meetings, and written and oral comments from Snowball's counsel. Rodriguez's letter gave multiple reasons, which are supported by the record, for denying the zone change. For example, Rodriguez stated that the density

48

of 215 units at the site would be "inconsistent with the surrounding density of the subject site"; the density of the surrounding area is undisputed. Rodriguez stated that the site is not within the City's Regional Housing Needs Assessment—a fact that is easily verified. Many citizens expressed concerns about evacuation in the event of a wildfire following recent evacuation attempts, and Rodriguez cited wildfire concerns in her letter. She noted the 2019 Saddle Ridge fire, for example, in which "88 structures were damaged, 19 were destroyed, one person died of a heart attack, and many schools were closed due to poor air quality that lingered for weeks. At its peak, more than 100,000 people were under mandatory evacuation." Again, this is public information that could easily be verified.

The information before PLUM and City Council therefore was not simply "opinion and speculation," as Snowball asserts. Substantial evidence is evidence "'of ponderable legal significance,'" which is reasonable in nature, credible, and of solid value. (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1260.) Snowball offers no authority supporting its suggestion that City Council was required to rely on certain evidence in the record regarding fire safety, but disregard other evidence on the same subject.

In sum, we find the HAA does not apply, and the City's findings were sufficient under the LAMC and supported by substantial evidence. We therefore affirm the trial court's denial of Snowball's petition.

## IV.   DISPOSITION

The judgment is affirmed.  The City is entitled to recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**


COLLINS, ACTING P.J.

We concur:


MORI, J.


ZUKIN, J.